308 So.2d 705

**Lula Nannie Ella REED and Fannie Reed Simmons**

v.

**Mary SHIPP et al.**

**SC 790.**

Supreme Court of Alabama.

Feb. 20, 1975.

Brooks, Garrett & Thompson and Ever-
ette A. Price, Jr., Brewton, for appellants.

**634**

Otts & Moore, Brewton, Joseph B. Nix, Jr., David T. Hyde, Jr., guardian ad litem, Evergreen, for appellees.

JONES, Justice.

This is an appeal by contestants (Lula Reed and Fannie Reed Simmons) from a judgment for proponents (Mary Shipp, Elsie Shipp Pate, Edna Shipp, and Elvis Shipp) in a will contest case. The trial Court directed the jury to render a verdict for the proponents.

We set out the trial Court's entire oral instruction to the jury, including the colloquy between the Court and counsel for contestants:

"Ladies and gentlemen of the jury, when you were impaneled to try this case, each one of you had previously taken an oath to well and truly try the issues involved and a true verdict render according to the evidence, so help you God. This oath which you take presupposes that the matter will be submitted to you for your determination. Under the facts of this case, the Court is duty bound, under the law, to withdraw this from the consideration of the jury and

to direct a verdict at your hands. I will give you now a verdict and I will ask you to go into the jury room and elect one of your number as foreman and sign which reads as follows: 'We, the jury, find for the plaintiffs and that the will and codicil thereto offered for probate is the valid last will and testament and codicil thereto of Mack L. Reed, deceased.'.

"This state of affairs is brought about by reason of the fact that the Court has determined, as a matter of law, that the contestants in this particular proceeding have not come forward with sufficient evidence of undue influence which was the only question involved in this case.[1] I am not going to go into real technicalities about the matter except to say this: *In order for the contestants to raise a jury question, as a matter of law, they must first prove a confidential relationship. In that regard, the Court felt there was sufficient evidence to be submitted to the jury; secondly, a person must have been favored under the will or must have done something which caused people close to her to be favored under the will and, of course, there were favored beneficiaries under the will, but the third element involved was this: That the favored beneficiary, either for herself or someone else, must have done and performed some undue activity in and about the procurement of the very will itself.* That, insofar as the Court is concerned, was the part which the judge has ruled as a matter of law is insufficient to be submitted to the jury and, of course, that means that the contest is a failure. These matters are not taken upon the shoulders of the Court lightly; they are, after much consideration and much soul searching and much application of law. I make this ruling in accordance with the authority of the case in the Supreme Court of Alabama decided on June 30, 1955, styled Locke v. Sparks, the citation being 263 Ala. 137, 81 So.2d 670. [Emphasis supplied.]

"Of course, you know the Judge here doesn't declare the law from case to case like he thinks it ought to be but he is bound by the cases which are precedents and which establish the law and the doctrine which the lawyers know as the law of *stare decisis.*

"At this time, ladies and gentlemen, I'll ask you to retire, to elect one of your number as foreman and to sign this verdict and bring it into the court in accordance with the instructions of the Court.

"MR. GARRETT: Your Honor, we want to be sure the record will show that we object to the ruling of the Court and that we note an exception.

"THE COURT: Let me say this to you, ladies and gentlemen: What this Judge does here is subject to review in another Court on another occasion and if the Judge is wrong about this, please rest assured that some other Court will straighten him out about this."

What "this Judge" did there is now here "subject to review in another Court on another occasion." Failing to find that "the Judge is wrong," and there being no necessity to "straighten him out about this," we affirm.

Mack L. Reed lived his entire life as a bachelor in the Castleberry community of Conecuh County, Alabama, where he died testate on February 16, 1973, at the age of 74. He executed a Last Will and Testament on June 30, 1964, leaving his real property to Mary Shipp, as trustee, in trust for, and proportioned by description among, her three minor children; his household furnishings to his unmarried sisters, Lula and Bertha Reed, with whom he lived; and the residue equally and directly to Edna, Elsie, and Elvis Shipp.

---

1. By stipulation of the parties, incorporated in the pretrial order, "undue influence" was the only issue in the case.

Bertha died in 1968, and Mack sold a 150-acre tract of his original 520 acres to his nephew, Arvis Simmons, on August 8, 1970. On August 19, 1970, he executed a codicil to his 1964 will which reapportioned his remaining real property (still to be held in trust) among the three Shipp children; left his household furnishings to his surviving unmarried sister, Lula; and gave the residue directly and solely to Elvis.

Contestants' brief begins:

"The appellants agree that the [above underlined] propositions of law as set forth by the trial court at the time the [directed verdict][2] was given [at the request of] the appellees reflects the elements presently needed to raise a prima facie case of undue influence in a will contest.

". . .

"Of course, we agree with the trial court that the appellants overcame the burden of proof as to the first two elements necessary in proving undue influence. But it is the court's conclusion regarding the third element, that is, activity in or about the procurement or execution of the will, which is erroneous . . ."

■ In support of this contention, appellants advance the proposition, with which we agree, that all that is needed to submit the case to a jury is a mere scintilla from which the jury can infer some undue activity in the procurement or execution of the will, and this can be proved by circumstantial evidence. Smith v. Moore, 278 Ala. 173, 176 So.2d 868 (1965).

■ The threshold legal question presented is aptly posed and its answer correctly stated by appellants' counsel:

"What type of activity is needed in the procurement or execution of a will [to constitute undue influence]? In Lewis v. Martin, 210 Ala. 401, 413, 98 So. 635, 647, (1923), the court approved the following charge which set forth the type of activity needed to establish a prima facie case:

"'The court charges the jury that, if they are reasonably satisfied from the evidence of the existence of a confidential relationship between the testatrix and William H. Lewis prior to and at the time of the making of the will, and that the said William H. Lewis was active in and about the execution and preparation of said will, such as the initiation of the proceedings for the preparation of the will, or participation in such preparation, employing the draftsman, selecting the witnesses, excluding persons from the testatrix at or about the time of the execution of the will, concealing the making of the will after it was made, and the like, then a presumption of undue influence arises, and casts on William H. Lewis the burden of showing that the will was not induced by coercion on his part, directly or indirectly.'"

The single dispositive issue, then, is whether an inference is raised by the evidence that Mary Shipp was "active" in and about the execution and preparation of the will, as undue activity is legally defined. Appellants urge:

"In the present case there was evidence from which a jury could reasonably infer that Mary Shipp employed the draftsman, excluded persons from the testator during his trip to Andalusia, and concealed the making of the will, either of which would establish a prima facie case of undue activity in or about the procurement or execution of the will when viewed in connection with the meretricious relationship and the unnatural disposition of the testator's property. . . Mrs. Lula Reed, sister of Mack Reed, who had stayed with Mack Reed longer than any other person . . . testified that after Mack Reed returned

2. See APJI—Civil, Will Contest, 38.09.

home to her to live, after an extended illness, Mary Shipp and her husband rushed Mack Reed from her house to go to Andalusia 'because they had a paper they wanted him to sign' . . . .. Further strengthening that testimony is the testimony of W. Sidney Fuller, the attorney who prepared both the will and codicil for Mr. Reed, where Mr. Fuller testified that the Reed codicil was prepared on August 19, 1970, which date was subsequent to the deed in question and that Mr. Fuller knew that someone else had brought Mr. Reed to Andalusia because he had been sick. . . .

"These two items of evidence shed a new light on *other evidence* presented so the jury could reasonably infer that Mary Shipp [unduly influenced Mack Reed in the making of his will]." [Emphasis supplied.]

The "other evidence" may be summarized: Mary Shipp and her husband, as neighbors of Mack Reed, worked for him almost continuously during the last 25 years of his life. Another neighbor "caught" Mack and Mary in 1950 "having a sexual relation in the barn." They were seen together on a day to day basis in the fields, in the truck going and coming from town, and at the livestock sales barns in Brewton and Evergreen. Although Mary's husband, Cary, worked for Mack, he was seldom seen with Mack during these years. Mack also spent considerable time with the children, carrying them in his arms when they were small, playing with them, buying for them, and referring to them as his children.

Lula, the unmarried sister with whom he lived, testified that her brother Mack was "foolish" about Mary; and a neighbor stated that from the conduct of these parties "anybody that didn't know them would have thought it was a man and wife and children."

Appellants contend:

"Because of the meretricious relationship and the unnatural disposition of testator's property, these facts are a sufficient basis from which a jury could infer, along with the authorities cited above that indicate no direct evidence is necessary regarding the activity in and about the procurement or execution of the will, that undue activity took place, in connection with the original will, and therefore, requires a reversal of the trial court."

We have no quarrel with the "authorities cited . . . that indicate no direct evidence is necessary."

The general rule is set out in 94 C.J.S. Wills § 253, p. 1130:

"The mere existence of illicit, improper, unlawful, or meretricious relations between the testator and the beneficiary or the beneficiary's mother is insufficient of itself to prove fraud or undue influence although the existence of such relations is an important fact to be considered by the jury along with other evidence of undue influence, giving to other circumstances a significance which they might not otherwise have; and much less evidence will be required to establish undue influence on the part of one holding wrongful and meretricious relations with the testator. Thus, when such a relation is shown, and it also appears that the testator made a highly unnatural disposition of his property *as a result of restraint, or any other agency which poisoned his mind,* there is sufficient evidence of undue influence." [Emphasis supplied.]

We observe with interest that one of the cases footnoted under the above quoted proposition is the case of Locke v. Sparks, 263 Ala. 137, 81 So.2d 670 (1955), the same case cited by the trial Judge in support of his directed verdict. Further, the *Locke* case clearly holds that, given an illicit relationship, some additional evidence —direct or circumstantial—of undue influence is necessary to meet the burden of proof.

Appellants do not contend that there was any evidence, direct or circumstantial, that the testator made any disposition of his property "as the result of restraint, or any other agency which poisoned his mind," in connection with the drafting or execution of his original will in 1964. Nor are we satisfied that the disposition of his property to the Shipp children was "highly unnatural" under the circumstances.

Chief Justice Chilton, speaking for the Court in 1856, in a strikingly similar case, stated:

"[T]o give a simpler illustration of [contestants' contention], if a man, who is unmarried and living the life of a bachelor, prostitutes a woman, violates the marriage bed, and, after many years of continuous illicit cohabitation, is influenced by the silent operation of these circumstances to make provision by his will for her children, who may be the issue of such illicit intercourse, the will is void. Such is not the law. The case of Farr v. Thompson, Cheves' Rep. 37, is a much stronger case than the one presented by the charge, and yet a provision for the prostitute was held valid. Undue influence, as that term is understood in this connection, must be such as, in some measure, destroys the free agency of the testator, and prevents the exercise of that discretion which the law requires a party should possess as essential to a valid testamentary disposition of his property. It is not enough that by the testator's own improper conduct he has brought about a condition of things, over which, at the time of making his will, he had no control to change or remedy, but which, as a moral inducement, operated upon his mind, influencing him to make a disposition of his property which, under other circumstances, he might not have made. If the testator was guilty of the enormity attributed to him in the charge, of continuous shameful intimacy with a married woman for many years, it would certainly not tend to mitigate his offence, should he have a spurious offspring dependent on her or her husband for support, to cast them pennyless upon the world. He may well be influenced, under such circumstances, by a desire to repair the injury he has done, so far as he can do so, by providing for their education and support . . . To vitiate a will, it must be such as, in some degree, to destroy the free agency of the testator, and constrain him to do what is against his will, but what he is unable to refuse or too weak to resist.—1 Jarman, (2d Amer. ed.) p. 36." Dunlap v. Robinson, 28 Ala. 100 (1856).

Almost a half century later, the New Jersey Supreme Court in In re: Willford's Will, N.J., 51 A. 501 (1902), reached the same conclusion in a similar factual context, and observed:

"The term [unnatural] is predicable of such instruments as ignore the moral claims upon the testator which the ties of kinship suggest. When there is a glaring disregard by a testator of a child —especially if such child is helpless by reason of infancy or disease,—in favor of a stranger, a court while saying that a man can do as he pleases with his property, will be alert in seeking for the presence of some influence which must have warped the judgment and controlled the will of the testator. The testamentary act is so unlike the product of a healthy and independent mind, that the act alone is strongly evidential of the existence of some extrinsic undue influence. The probative force of such a testamentary act rises and falls in the degree of its unusuality and unreasonableness, and therefore the character and degree of probative force of extrinsic testimony required to prove undue influence must increase in the proportion that the unreasonableness of the testamentary act diminishes."

See also Dees v. Metts, 245 Ala. 370, 17 So.2d 137 (1944).

■ At any rate, it is settled law in Alabama that no presumption of undue activ-

ity in the procurement of a will amounting to fraud or undue influence arises from the mere disposition by the testator of his property to these children whom he loved and treated as his own. If they were indeed his children, or if he thought they were, influenced to provide for them he may have been; but *unduly* influenced, as that term is legally understood, is entirely another matter.

Alternatively, appellants seek to have us view this evidence as constituting some inference of undue activity in the procurement of the codicil to the will. The challenge is intriguing, but judicial restraint requires that we not decide some issue wholly unnecessary to our opinion.

 While it is established law in our state that a codicil republishes a will as of the date of the codicil, and that the two instruments are construed as one instrument as of the date of republication (Kelley v. Sutliff, 257 Ala. 371, 59 So.2d 65 (1952)), this is a rule of construction which is inapplicable to the principle of undue influence.

Central to "undue influence" is the second element set out in the trial Court's charge, i. e., "a person must have been favored under the will or must have done something which caused people close to her to be favored . . .". The trial Court's finding that " . . . of course there were favored beneficiaries under the will" necessarily referred to the original will, because, as we have seen, the codicil merely conformed the testator's prior wishes— at the time of the original will—to the current status of his property holdings at the time of the codicil. It is apparent that the testator's execution of the codicil was a mere updating of his personal affairs. Indeed, under the codicil the children received an aggregate of 150 acres less by virtue of a prior conveyance, while Lula (the testator's sister and one of the contestants) received all rather than ½ of the household furnishings by virtue of Bertha's prior death.

Assuming, without deciding, that Mary "unduly influenced" the testator to execute his 1970 codicil to his 1964 will, we must yet ask: What did her children, as "favored beneficiaries" under the original will, gain by way of the codicil? Clearly, since the only result thereby affected was a reapportionment of the testator's remaining real property (150 acres less than originally devised), the question is self-answering—absolutely nothing.

There was no error in the action of the trial Court in directing a verdict for the proponents of the will.

Affirmed.

HEFLIN, C. J., and MERRILL, MADDOX and SHORES, JJ., concur.